## Case No. 9,019.

### The MANHASSET.

### The HIRAM PERRY.

[6 Ben. 301.][1]

District Court, S. D. New York. Jan., 1873.

COLLISION — EAST RIVER — TUG-BOAT AND TOW — STEAMERS CROSSING—WILFUL TORT— JOINT NEGLIGENCE.

1. A tug, having several boats in tow, coming down the East river, on an ebb tide, rounded to

---

[1] [Reprinted from 5 N. B. R. 491, by permission.]

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

to pick up another boat on the New York side, just above the Fulton ferry slip. A Fulton ferry-boat, coming out of that slip, came in collision with the stern boat on the port side. The ferry-boat claimed that, when she came out of the slip, the tug was going down the river, and that, after the ferry-boat got headed up the river against the tide, the tug turned around across her course. Her pilot stated that, as soon as he saw her sheer, he rang a bell to slow the engine, and then to stop and back; and the engineer testified that he made four or five turns of the engine ahead, under the bell to slow, before he stopped and backed. The speed of the ferry-boat was nearly done at the collision, and she struck the boat about twenty-five feet from her stern. The owner of the boat filed a libel against both the tug and the ferry-boat, but the tug was not seized under the process. On the trial, a motion was made, on behalf of the ferry-boat, that the libellant be compelled to bring in the tug, or the libel be dismissed. The motion was denied, but the libel was directed to be amended by striking out the prayer for process against the tug. On the trial, one of the libellant's witnesses testified, that it looked to him as if the ferry-boat hit the boat intentionally. The owners of the ferry-boat claimed that she was not liable for the wilful tort of her pilot: *Held,* that, on the story of the ferry-boat, when the tug had turned so as to be heading across the river, the courses were crossing, and the ferry-boat, having the tug on her starboard hand, was bound to avoid her and her tow, and when the tug had turned so as to head up the river, the ferry-boat was the following boat, and was still bound to avoid them.

2. The ferry-boat was in fault in not stopping and backing at once, as soon as her pilot saw the tug turn, instead of keeping on under a slow bell.

3. The act of the pilot of the ferry-boat was not wilful, in such sense as to relieve the ferry-boat from liability for the result of it.

4. Although the libel was filed against both tug and ferry-boat, the libellant could recover against the ferry-boat alone, because there was independent fault on her part, and any fault in the tug in sheering was not a fault which contributed to the collision.

In admiralty.

Beebe, Donohue & Cooke, for libellant.
B. D. Silliman, for claimants.

BLATCHFORD, District Judge. The libellant, as owner of an empty coal barge or chunker, which was in tow of the steam-tug Hiram Perry, on the 13th of January, 1869, seeks to recover, in this suit, the damages sustained by him, by means of a collision which took place, about noon on that day, between the ferry-boat Manhasset, then on a trip from her slip at the foot of Catherine street, in New York, to her slip at the foot of Main street, in Brooklyn. The tug had six boats in tow, namely, two on each side of her, alongside, and two astern, the libellant's boat being one of the two astern, and being tailed on to the stern of the boat which was next to the tug on the port side of the latter. This chunker was a boat in two parts, divided crosswise. The stem of the ferry-boat struck the port side of the after half of the chunker, at about the middle of its length, and it soon afterwards sank. The tug, with her tows, was bound from the Wallabout, in Brooklyn, to South Amboy, and was about to pick up another empty

boat, on the New York shore, at a point above the New York slip of the ferry-boat. The tide was strong ebb.

The story of the libel is, that the tug, when nearing the point where she desired to pick up the additional boat, rounded towards the New York shore, with the view of heading up to the tide; that, while she was heading in towards the New York shore, and gradually turning towards the east, the boats following in her wake, the ferry-boat came out of her slip, and, as she came out, gradually turned, so as to head to the east, and, keeping on, struck the chunker; that the approach of the ferry-boat was not noticed by those on the tug, until just as she was striking the chunker; that the collision was caused by the joint negligence of the two steam vessels, the ferry-boat being in fault in not going under the stern of the chunker, and the tug in not keeping a lookout; and that the chunker was entirely helpless and without fault. The libel prays for process against both the ferry-boat and the tug, and that they may both be condemned. Process was issued against both vessels, but was not served on the tug, and she has not appeared or answered. The ferry-boat was served with process, and appeared and answered. At the trial, a motion was made on the part of the ferry-boat, that the libellant be compelled to bring in the tug, or the libel be dismissed. The motion was denied, except so far as to direct the libel to be amended by striking out the prayer for process against the tug.

The answer of the ferry-boat denies the allegation of the libel, that the tug is within this district. It sets up, that, on the coming out of the ferry-boat from her slip into the river, her pilot saw the tug and her tows in the middle of the river, heading down; that there was nothing to indicate any intended change in their course; that their position and the rate of the tide were such, that the ferry-boat could not have crossed the river in front of them without great danger of collision with them, and could not have made her proper and necessary course, at that state of the tide, if she had crossed in front of them; that, therefore, and thereupon, she was headed up the river, against the tide, in order that she might safely pass between them and the New York shore, as prudence and good navigation required her to do, and as was the obvious and proper and usual course, under such circumstances, and as there was plenty of room for her to do; that the course on which the ferry-boat was thus placed was such, that, but for the misconduct of the tug, or the tug and chunker, or the tow, or those managing and having charge of the same, she would easily have gone clear of the tow and of the chunker, and between the same and the New York shore; that, while the ferry-boat was thus proceeding on her course, and on a line widely clear of, and parallel to, the line on

which the tow, including the tug, was moving, the tug and tow suddenly sheered in rankly towards the New York shore, across the course and track of the ferry-boat; that, perceiving that such action of the tug and tow would render a collision probable, the ferry-boat at once stopped her engines, and reversed her wheels, and backed, and did everything in her power to avoid collision with the tug, or her tow, or any part thereof, but, as the tug sheered across the tide, and changed her heading against it, the chunker was swung down, by the strong ebb tide, upon and against the bow of the ferry-boat; that, at the time of the collision, the ferry-boat had no headway whatever, and did not run into, or against, the chunker; that the approach of the ferry-boat was not noticed by those on the tug until just at the time of the collision; that the tug had no lookout at the time; that, if the chunker had been properly managed at the time, the collision might have been avoided; that it resulted, in part, from such mismanagement of the tug, and also from the omission of the chunker seasonably to shift her lines, and to be so steered as to aid the ferry-boat in avoiding the collision; that the ferry-boat, during the whole of her trip, was navigated with skill, care and caution, and everything that could be done to avoid the collision, or to lessen its violence, when it became inevitable, was done by those in charge of the ferry-boat; and that the collision was caused wholly by the carelessness, negligence, and want of skill and prudence, and bad management, and bad and improper navigation, of the tug, or of the chunker, or of both, and of the persons then in charge of the same, or some of them.

Three witnesses have been examined on behalf of each party—the libellant himself, on his own behalf; and, on his part, the master of the tug, and her pilot. The libellant was on his own boat, at the time of the collision. The master of the tug was in her pilot house, steering her. Her pilot was on one of the boats on her starboard side. The witnesses for the ferry-boat are three persons from her—her pilot, who was in her pilot house, steering; a deck hand, who was standing at the king post, on her port side, at her bow; and her engineer, who was in her engine room, below deck.

It is impossible to conceive of stories more diametrically opposite than those which these witnesses tell. The libellant, and Conlon, the pilot of the tug, assert that the tug had turned and got headed pretty well around towards up the river, and angling upwards towards the New York shore, before the ferry-boat left her slip. Both of them say that they saw the ferry-boat as she was coming out of her slip. Parisen, the master of the tug, says that he did not see the ferry-boat leave her slip; that she had not left her slip when he began to round; that he did not see her until he had got headed about two-thirds up the river; and that, when he first saw her, she was about thirty or forty feet off from the chunker.

Kershaw, the pilot of the ferry-boat, says, that, as he started to go out of his slip, he saw the tug heading down the river; that she was so heading when he went out of the slip; that he headed up the river, and would have passed one hundred feet or more to the New York side of her, but, after he got straightened up the river, the tug changed her course, and turned short across the bow of the ferry-boat, without making any signal before sheering; that he rang to slow, stop and back, when the tug sheered; that the tug went one hundred feet clear of the ferry-boat, across her bow, but the strong tide swept the chunker down against the ferry-boat; and that the tug was heading very nearly straight up the river, the same way with the ferry-boat, at the time of the blow. Boyd, the deck hand on the ferry-boat, says, that, as the ferry-boat went out of the slip, he saw the tug heading down the river; that the ferry-boat turned up, and, after she got straightened up, the tug, without making any signal, rounded to across the bow of the ferry-boat; and that, at the collision, the tug was the length of two boats away, and headed up the river about the same way with the ferry-boat.

Although positively testified to by the witnesses for the ferry-boat, it requires great faith to believe it possible that in the short space of time which elapsed between the time the ferry-boat left her slip and the collision, the tug could have left a straight course down the river and rounded to and described a complete half circle, and come to head directly up the river, the same way with the ferry-boat. The story on the part of the libellant is much the more probable one, in view of all the circumstances surrounding the occurrence. But it is not necessary to solve this question, for, even assuming that the tug did not begin to turn till after the ferry-boat was coming out of her slip, the evidence on the part of the ferry-boat shows that she ought to have avoided the collision, and might have done so. From the time the tug, in turning, got so far around as to head so towards the New York shore, that her course was crossing that of the ferry-boat, the ferry-boat, having her on the starboard side, was bound to avoid her and her tow. So, from the time the tug, in turning, got so far around that the ferry-boat became the following boat, the ferry-boat was bound to avoid the tug and her tow. The pilot of the ferry-boat says, that he rang his bell to slow when the tug sheered, as soon as he saw her sheer; that he then immediately rang the bells to stop and back; and that the way of his boat was about done, when the collision took place. The engineer of the ferry-boat says, that, on starting from the slip, he received one bell, to go ahead; that, while running under that bell he received another

bell; and that, on receiving this last bell, he shut his engine off. That was a bell to slow. To shut off, is to slow, not to stop. The bell to slow was the bell which the pilot says he rang as soon as he saw the tug sheer. The engineer says, that he made four or five turns ahead, while so running slowed down, and then received two bells to back; that he had made about four or five turns back before he felt the blow of the collision; and that, with such a strong ebb tide as there then was, four or five turns back would pretty much kill the headway of the boat. As it was, the ferry-boat almost avoided the collision. She did not strike a point further forward on the chunker than twenty-five feet forward from the extreme rear. I cannot resist the conclusion that, if the ferry-boat, instead of continuing to run ahead four or five turns, under the slow bell, had stopped and backed sooner than she did, the collision would have been avoided, and she would have passed under the stern of the chunker. The pilot of the ferry-boat says, that the way of his boat was about done when she struck the chunker. If this was so, and if the four or five turns back effected that result, more turns back, instead of the four or five turns ahead, under the slow bell, would, undoubtedly, with the strong ebb tide, as the tug was going ahead, have enabled the ferry-boat to clear the tow.

One of the witnesses for the libellant stated, in his testimony, that, in his judgment, the ferry-boat did not try to avoid the chunker; and that it looked to him as if the ferry-boat hit her intentionally. The claimants, assuming this as a fact proved, urge, that the ferry-boat is not liable for a collision caused by the wilful fault of her pilot. But, the wilful character of the act is not set up in the libel, nor is it averred in the answer, and it is very far from being established by the above-mentioned remark of the witness. There is nothing to show that the act was wilful, in the sense of being malicious, or that the ferry-boat ran against the chunker because of an intention to do so on the part of her pilot. The act was wilful in one sense, because the acts of the pilot were the voluntary emanations of his will, but there is nothing to show that his intention was to cause a collision.

It is also urged, for the claimants, that, as the libel alleges joint negligence in the tug and the ferry-boat, as the cause of the collision, the tug ought to have been brought in by process, she having been made a party by the libel. But this point is disposed of by the amendment referred to. The suit stands, and was tried, as one against the ferry-boat alone. The only question is, as to whether the ferry-boat was guilty of independent fault or negligence which caused the collision. The chunker was helpless, and did nothing to cause the collision. The fact that the tug may also have been in fault, in some particular, is of no consequence, as respects fault on the part of the ferry-boat, provided the fault of the ferry-boat is one distinct from, and independent of, any alleged fault on the part of the tug. The only fault set up, on the part of the ferry-boat, as a fault in the tug, is, that the tug suddenly sheered across the course of the ferry-boat. But notwithstanding the tug may have sheered, to turn, after the ferry-boat left her slip, there was the separate and independent fault, on the part of the ferry-boat, which has been pointed out. The allegation of her answer, that she at once stopped her engines and reversed her wheels and backed, on perceiving the sheer of the tug and tow, and that it would render a collision probable, is disproved by the testimony of her engineer. For the fault of the ferry-boat, the libellant is entitled to recover his full damages against the ferry-boat alone, because, in the view I take of the case, any fault there may have been on the part of the tug, in sheering, was not a fault which contributed to the collision which the fault of the ferry-boat caused. The ferry-boat ought to have, and could have, avoided the chunker, in the actual predicament, whether the chunker was brought to her position by a sheer before, or a sheer after, the ferry-boat left her slip.

There must be a decree for the libellant, with costs, with a reference to a commissioner to ascertain the damages sustained by the libellant.